

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-25-2007

# USA v. Vitillo

Precedential or Non-Precedential: Precedential

Docket No. 05-4330

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation
"USA v. Vitillo" (2007). *2007 Decisions.* Paper 829.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/829

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 05-4330/4331/4332

UNITED STATES OF AMERICA

v.

JOHN VITILLO, VITILLO CORPORATION and
VITILLO ENGINEERING, INC.

Appellants.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 03-cr-00555-1)
District Judge: Hon. R. Barclay Surrick

Argued December 11, 2006

Before: SMITH and ROTH, <u>Circuit Judges</u>,
*IRENAS, <u>District Judge</u>

(Opinion filed : June 25, 2007)

    *Honorable Joseph E. Irenas, United States District Judge
for the District of New Jersey, sitting by designation.

Henry E. Hockeimer, Jr., Esquire **(ARGUED)**
Ballard, Spahr, Andrews & Ingersoll
1735 Market Street, 51st Floor
Philadelphia, PA 19103

       Counsel for Appellants

Rebecca Y. Starr, Esquire
Hangley, Aronchick, Segal & Pudlin
One Logan Square, 27th Floor
Philadelphia, PA 19103

       Counsel for Appellants


Peter D. Hardy, Esquire **(ARGUED)**
Office of the United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

       Counsel for Appellee

Patrick L. Meehan, Esquire
Office of the United States Attorney
Robert A. Zauzmer, Esquire
Office of the United States Attorney
Robert E. Goldman, Esquire
Office of the United States Attorney
504 West Hamilton Street, Suite 3701
Allentown, PA 17901

       Counsel for Appellee

# OPINION

**ROTH,** <u>Circuit Judge</u>:

In this white collar criminal case, we address the scope of 18 U.S.C. § 666, which prohibits theft from programs, receiving federal funds, by agents of the organizations which administer those programs. Specifically, we consider whether an independent contractor with managerial responsibilities may be an "agent" under § 666.

John Vitillo, Vitillo Corporation, and Vitillo Engineering, Inc., were charged with several counts of theft, in violation of § 666(a)(1)(A), and conspiracy. A federal jury convicted each defendant on all counts. Defendants filed a FED. R. CRIM. P. 33(a) motion for a new trial based on alleged prosecutorial misconduct. The District Court denied the motion on April 29, 2005. Through new counsel, and approximately six months after trial, defendants filed a Rule 12(b)(3)(B) motion to dismiss the indictment for failure to state an offense. The District Court denied this motion on July 19, 2005. On September 12, 2005, the District Court sentenced John Vitillo to imprisonment and the corporate defendants to probation, and ordered all defendants to pay $317,760 in restitution. Defendants appeal the restitution order, as well as the District Court's April 29 and July 19 orders.

Because we find that independent contractors such as John Vitillo and his corporations, Vitillo Corporation and Vitillo Engineering, Inc., are not excluded from the § 666(d)(1) definition of "agent" and because the indictment sufficiently states a federal offense, we will affirm the District Court's order denying defendants' motion to dismiss the indictment. Because we find no prejudice with regard to prosecutorial misconduct, as the evidence of guilt is overwhelming, we will affirm the District Court's order denying defendants' motion for a new trial. Finally, because we find the restitution figure sufficiently

3

grounded in the evidence, we will affirm the judgment of sentence.

## I. BACKGROUND

At the relevant times, 1997-2000, the Reading Regional Airport (the Airport or RRA), located in Berks County, Pennsylvania, was a small airport that provided services to private and commuter airplanes. The Airport was owned by the City of Reading and managed by the Reading Regional Airport Authority (the Authority or RRAA), a local government agency that received significant funding from the Federal Aviation Administration. One of the Authority's federally-funded projects was its Terminal Expansion Project. Of the approximately $3 million the Authority received from the federal government between 1997 and 2000, approximately $1.5 million was set aside for this project.

Because the RRA was a small, regional airport, the Authority did not have a primary engineer on staff. In 1997, the Authority appointed John Vitillo's company, the Vitillo Group, Inc. (later reorganized into the Vitillo Corp. and a subsidiary, Vitillo Engineering, Inc.), of which he was president, to serve as the Authority's "primary engineer and principal engineering consultant." Vitillo and his companies, which billed for their work at an agreed-upon hourly rate, worked for the Authority from 1997 through 2000. During this time period, Vitillo managed several projects at the Airport, the largest of which related to managing the Terminal Expansion Project, which took over two years to complete.

On June 19, 2002, Assistant United States Attorneys (AUSAs) Robert Goldman and Kathleen Rice accompanied several FBI agents as they executed a search warrant at the office of Vitillo Corporation. The government suspected that John Vitillo and his companies were engaged in a massive overbilling scheme to defraud the Authority. During this search, the FBI agents seized various time cards and billing records. Additionally, with the consent of Vitillo's attorney, whose presence had been requested, Special Agent Thomas Neeson

4

interrogated John Vitillo about his companies' billing practices. The interview was not recorded but was conducted in the presence of the AUSAs, who later served as trial counsel.

A federal grand jury in the Eastern District of Pennsylvania returned an indictment[1] against Vitillo and his companies, charging each with three counts of theft from an organization receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(A), and one count of conspiracy to violate § 666, in violation of 18 U.S.C. § 371. Defendants pleaded not guilty to all counts. At trial, the government presented substantial evidence that Vitillo and his companies – which had been in dire financial condition prior to contracting with the Authority – systematically created fraudulent invoices for work that was never actually performed at the Airport, thus defrauding the Authority of hundreds of thousands of dollars. Agent Neeson testified against the Vitillo defendants, as did Vitillo's own employees, who described their involvement in the fraudulent billing scheme; corporate records – parallel sets of phony and real time cards seized from Vitillo Corporation's offices – corroborated their testimony.

During opening statements and witness examination, AUSA Goldman made the jury aware that he and his co-counsel, AUSA Rice, had been present when Agent Neeson interrogated John Vitillo. Defense counsel objected and unsuccessfully moved for a mistrial, alleging that the prosecutors were improperly vouching for Agent Neeson's credibility. Also, during cross-examination of Vitillo, AUSA Goldman repeatedly asked Vitillo to comment on the veracity of Agent Neeson, but no objections were lodged.

The jury returned a verdict, finding Vitillo and his companies guilty on all four counts. The Vitillo defendants filed post-trial motions for a new trial and to dismiss the indictment, but both motions were denied. They never filed a motion

---

[1]The Second Superceding Indictment is the relevant indictment in this case.

challenging the sufficiency of the evidence. The District Court sentenced John Vitillo to 36 months of imprisonment and two years of supervised release. The corporate defendants were sentenced to 5 years of probation. Defendants were also ordered to pay $317,760 in restitution, jointly and severally. The District Court based this figure on evidence of loss presented during trial and in the presentence investigation report.

## II. DISCUSSION

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. Appeal was timely. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

### A. Sufficiency of the Indictment

As a preliminary matter, the parties quibble over whether the Vitillo defendants' challenge to the indictment is a "jurisdictional" or "pleading" challenge. Their "Motion to Dismiss the Indictment for Lack of Jurisdiction" was filed pursuant to FED. R. CRIM. P. 12(b)(3)(B), which states that, "at any time while the case is pending, the court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense." The Vitillo defendants alleged in the District Court, as they do on appeal, that the indictment fails to set forth facts establishing that they are an "agent" of a local government agency receiving federal funds as that term is defined in 18 U.S.C. § 666(d)(1). They do not assert that we lack jurisdiction to consider the appeal. They cannot, as "defects in an indictment do not deprive a court of its power to adjudicate a case." *United States v. Cotton*, 535 U.S. 625, 630 (2002); *see also Lamar v. United States*, 240 U.S. 60, 64 (1916) (rejecting claim that "the court had no jurisdiction because the indictment does not charge a crime against the United States"). Rather, they argue that the indictment fails to plead sufficient facts to establish a violation of a federal offense. We conclude that Vitillo's challenge to the indictment is more properly characterized as a "pleading" challenge than one of "jurisdiction." *Cf. United States v. Panarella*, 277 F.3d 678, 682 n.1 (3d Cir. 2002) ("Indeed, we are unsure whether use of

the term "jurisdictional" to refer to challenges to the sufficiency of an indictment is anything more than simply a label used to announce the conclusion that a particular defense survives a guilty plea."). Plenary review applies. *United States v. Whited*, 311 F.3d 259, 262 (3d Cir. 2002).

Another threshold issue is whether we should consider the factual record developed at trial in assessing the sufficiency of the indictment. This issue arises because of the unusual procedural posture of this case – the Vitillo defendants challenged the sufficiency of the indictment long after the jury returned its guilty verdict. Because the sufficiency of the *evidence* is not an issue on appeal (the Vitillo defendants waived their right to challenge the jury's verdict by failing to do so within the 7-day time limit under Rules 29, 33 or 34), the government argues that our review should be confined to the four corners of the indictment. In contrast, the Vitillo defendants argue that it "defies logic to deny the court an opportunity to consider the complete record before it," but they cite no authority for this proposition. Specifically, they argue that we should consider the Engineering Consultant Agreement executed by the Vitillo Group, Inc., and the RRAA because the indictment specifically refers to that contract.

It is well-established that "[a]n indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, *if valid on its face*, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more." *Costello v. United States*, 350 U.S. 359, 363 (1956) (footnote omitted and emphasis added). Indeed, we have previously held that, "for purposes of Rule 12(b)(2) [later superceded by Rule 12(b)(3)(B)], a charging document fails to state an offense if the specific facts alleged *in the charging document* fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *Panarella*, 277 F.3d at 685 (emphasis added); *see also United States v. Taylor*, 154 F.3d 675, 681 (7th Cir. 1998) ("The validity of an indictment is not affected by the form of the evidence considered, and an otherwise valid indictment cannot be challenged on the ground that the grand jury based it on inadequate or incompetent

evidence."). We conclude that the Vitillo defendants' Rule 12(b)(3)(B) challenge to the sufficiency of the indictment should be decided based on the facts alleged within the four corners of the indictment, not the evidence outside of it.[2]

"An indictment is generally deemed sufficient if it: [sic] (1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir. 1989) (quotation marks and citations omitted). An indictment must allege more than just the essential elements of the offense. *See Panarella*, 277 F.3d at 685 ("We are thus constrained to reject the government's contention that an indictment or information charges an offense, for purposes of Rule 12(b)(2) [later superceded by Rule 12(b)(3)(B)], as long as it recites in general terms the essential elements of the offense, even if the specific facts alleged in the charging instrument fail to satisfy those elements."). An indictment fails to state an offense if the specific facts alleged in it "fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *Id.*

### 1. Statutory Interpretation of § 666

When interpreting a federal criminal statute, "we must pay close heed to language, legislative history, and purpose in order strictly to determine the scope" of the forbidden conduct. *Dowling v. United States*, 473 U.S. 207, 213 (1985). Any

---

[2]If we were to consider facts extrinsic to the indictment, we would effectively permit the Vitillo defendants to circumvent the 7-day time limit for challenging the sufficiency of the evidence, *see, e.g.* FED. R. CRIM. P. 29(c)(1) (motion for judgment of acquittal after jury verdict or discharge), by way of his Rule 12(b)(3)(B) motion, which has no time limit for filing.

ambiguity in the language of a criminal statute should be resolved in favor of the defendant. *United States v. Bass*, 404 U.S. 336, 347 (1971). However, "§ 666 is extremely broad in scope," *United States v. Sotomayor-Vazquez*, 249 F.3d 1, 8 (1st Cir. 2001) (citing *Salinas v. United States*, 522 U.S. 52, 55-61 (1997)), as that statute seeks to ensure the integrity of vast quantities of federal funds previously unprotected due to a "serious gap in the law," *United States v. Cicco,* 938 F.2d 441, 445 (3d Cir. 1991) (quoting the legislative history of § 666). *See also United States v. Rooney*, 37 F.3d 847, 851 (2d Cir. 1994) (citing the legislative history of § 666 and concluding that "Congress intended the terms of the statute to be 'construed broadly'").

Section 666 prohibits, *inter alia*, "an agent" of a local government agency that receives more than $10,000 in federal funds from stealing from that agency property valued at more than $5,000.[3] The term "agent" is defined as "a person

---

[3]Section 666 states in full:

**§ 666.   Theft or bribery concerning programs receiving Federal funds**

> **(a)** Whoever, if the circumstance described in subsection (b) of this section exists–
>
> > **(1)** being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof–
> >
> > > **(A)** embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that–
> > >
> > > > **(i)** is valued at $5,000 or more, and

(continued...)

9

[3](...continued)

**(ii)** is owned by, or is under the care, custody, or control of such organization, government, or agency; or

**(B)** corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more; or

**(2)** corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;

shall be fined under this title, imprisoned not more than 10 years, or both.

**(b)** The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

**(c)** This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses

(continued...)

authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a

[3](...continued)
paid or reimbursed, in the usual course of business.

**(d)** As used in this section--

**(1)** the term "agent" means a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative;

**(2)** the term "government agency" means a subdivision of the executive, legislative, judicial, or other branch of government, including a department, independent establishment, commission, administration, authority, board, and bureau, and a corporation or other legal entity established, and subject to control, by a government or governments for the execution of a governmental or intergovernmental program;

**(3)** the term "local" means of or pertaining to a political subdivision within a State;

**(4)** the term "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States; and

**(5)** the term "in any one-year period" means a continuous period that commences no earlier than twelve months before the commission of the offense or that ends no later than twelve months after the commission of the offense. Such period may include time both before and after the commission of the offense.

servant or employee, and a partner, director, officer, manager, and representative."  18 U.S.C. § 666(d)(1).

The Vitillo defendants argue that, as a matter of statutory interpretation, the term "agent" does not apply to them as they are described in the indictment.  The indictment alleges that Vitillo Group, Inc., "was appointed by the Authority as the primary engineer and principal engineer consultant for the Authority and the RRA" and that, by written agreement, Vitillo Engineering, Inc., was made the "construction *manager* of the RRA Expansion Project with compensation to [be] paid to defendant Vitillo Engineering, Inc. based upon the number of hours worked . . ." (emphasis added).[4]  The Vitillo defendants

---

[4]Count One of the indictment states in relevant part:

11.  In or about October 1997, Vitillo Group, Inc. was appointed by the Authority as the primary engineer and principal engineer consultant for the Authority and the RRA.  In or about April 1998, defendant VITILLO ENGINEERING, INC. assumed Vitillo Group, Inc.'s duties with the Authority and the RRA.  Defendant VITILLO ENGINEERING, INC. submitted its bills for services to the Authority through defendant VITILLO CORPORATION.

12.  On or about December 10, 1998, a contract was signed between the Authority and defendant JOHN VITILLO making defendant VITILLO ENGINEERING, INC. the construction manager of the RRA Expansion Project with compensation to paid [sic] to defendant VITILLO ENGINEERING, INC. based upon the number of hours worked by its employees.

13.  Between in or about February 1998 and in or about January 2001, in Berks County, in the Eastern District of Pennsylvania and elsewhere, defendants . . . and various employees known to the grand jury, acting as
(continued...)

12

argue that these specific allegations are insufficient to place them within the ambit of § 666(d)(1)'s definition of "agent."[5] Specifically, the Vitillo defendants point out that the indictment fails to establish that they had any control over any federal funds, because Vitillo Engineering, Inc., through Vitillo Corporation, had to bill the Authority for services on an hourly basis.

Because § 666(d)(1) does not define an "agent" as someone who necessarily controls federal funds, we conclude that the Vitillo argument fails. *See United States v. Phillips*, 219 F.3d 404, 422 n.3 (5th Cir. 2000) (Garza, J., dissenting) ("[T]he expansive statutory definition of 'agent' . . . recognizes that an individual can affect agency funds despite a lack of power to authorize their direct disbursement."). According to the statutory definition, an "agent" is merely a person with authority to act on behalf of the organization receiving federal funds, and can include, *inter alia*, an "employee," "officer," "manager" or

---

[4](...continued)

> agents of the Reading Regional Airport, an organization which received benefits of over $10,000 in any one year period under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance or other form of federal assistance, conspired and agreed together and with other persons known and unknown to the grand jury to embezzle, steal, and obtain by fraud property valued at $5,000 or more, which money was owned by and under the care, custody and control of the Reading Regional Airport Authority, in violation of Title 18, United States Code, Section 666(a)(1)(A).

Using similar charging language as in Count I and incorporating the factual allegations therein, Counts II, III and IV charged the same type of fraud under the same statute for different time periods. All three defendants were charged with all four counts. The jury found all defendants guilty on all counts.

[5]Vitillo does not challenge any other aspect of the indictment.

13

"representative" of that entity. 18 U.S.C. § 666(d)(1). There is nothing in the statute to suggest that we should consult extrinsic sources, such as the Restatement of Agency, in attempting to further define "agent." To do so might result in the improper importation of extraneous language into the statutory text. *Phillips*, 219 F.3d at 422 n.2 (Garza, J., dissenting) ("We must interpret § 666(d) as written, and cannot use hornbook agency principles to restrict the broad definition of 'agent' that Congress provided."); *see also* Comprehensive Crime Control Act of 1983, S. Rep. No. 98-225, S.1762, at 370 (1983) ("agency . . . [is] defined in [§ 666(d)(1)] and require[s] no further explication").

The Vitillo defendants propose a second dubious interpretation. They argue that, because the term "independent contractor" – which would apply to the Vitillo defendants according to the facts alleged in the indictment – is not a term listed in § 666(d)(1), the Vitillo defendants are by definition excluded from the statute's coverage. We reject this argument as well because the § 666(d)(1) list that "*includes*" the terms "servant," "employee," "partner, director, officer, manager, and representative" is, by its own plain language, not exhaustive.

We therefore conclude that, as a matter of statutory interpretation, § 666(d)(1) does not by definition exclude an independent contractor who acts on behalf of a § 666(b) entity as a manager or representative of that entity.

### 2. Construction of the Factual Allegations in the Indictment

Having concluded that an independent contractor may be covered by § 666, we consider whether the indictment alleges facts sufficient to demonstrate that the Vitillo defendants acted on behalf of the Authority or Airport as managers or representatives of those entities. In doing so, we construe the factual allegations in the indictment liberally. That is because

"'indictments which are tardily challenged are liberally constructed in favor of validity.'" *United States v. Wander*, 601 F.2d 1251, 1259 (3d Cir. 1979) (citing *United States v. Pheaster*, 544 F.2d 353, 361 (9th Cir. 1976)); *see also United States v. Watkins*, 709 F.2d 475, 478 n.2 (7th Cir. 1983). Although the failure of an indictment to state an offense is "a fundamental defect which can be raised at any time," judicial interests "require that such challenges be made at the earliest possible moment." *Pheaster*, 544 F.2d at 361. One interest is in avoiding the needless waste of limited judicial resources. *Id.*; *see also United States v. Panarella*, 277 F.3d 678, 686 (3d Cir. 2002) (criticizing the rule permitting a defendant who enters an unconditional guilty plea to challenge on appeal the charging instrument's failure to allege facts sufficient to state an offense). Another important interest is in discouraging tactical delays by defendants seeking "a convenient ground of appeal" in the event of a guilty verdict. *Pheaster*, 544 F.2d at 361; *see also Panarella*, 277 F.3d at 686 (citing 4 Wayne R. LaFave et al., *Criminal Procedure* § 19.1(d), at 741 n.50 (2d ed. 1999) ("The facts of various cases indicate that the practice of sandbagging, by deliberately postponing the objection, continues as to these defects, particularly the failure to charge an offense.")). We will uphold the indictment against Vitillo "unless it is so defective that it does not, by any reasonable construction, charge an offense" under § 666. *United States v. Childress*, 58 F.3d 693, 720 (D.C. Cir. 1995) (quotation marks and citations omitted).

Applying this principle along with the requirement of FED. R. CRIM. P. 7(c)(1) that an indictment be "a plain, concise, and definite written statement of the essential facts constituting the offense charged," we address whether the indictment alleges facts sufficient to establish that the Vitillo defendants were "agents" under § 666. The indictment alleges that John Vitillo was president of Vitillo Group, Inc.; that Vitillo Group, Inc., became Vitillo Engineering, Inc.; that John Vitillo created Vitillo Corporation and Vitillo Engineering, Inc., became a subsidiary of Vitillo Corporation; that Vitillo Engineering, Inc., was the primary engineer and principal engineer consultant for the Authority and the RRA; that Vitillo Engineering, Inc.,

submitted its bills to the Authority through Vitillo Corporation; and that John Vitillo signed the contract with the Authority on behalf of Vitillo Engineering, Inc., making Vitillo Engineering, Inc., the construction *manager* of the RRA Expansion Project.

Section 666(d)(1) defines an "agent" as, *inter alia*, a "manager" of the § 666(b) entity receiving federal funds. Therefore, in light of the statutory interpretation we have conducted above, we conclude that the indictment alleges facts sufficient to establish that the Vitillo defendants were "agents" under § 666. The indictment thus properly states the federal offense for which the Vitillo defendants were convicted.

## B. Prosecutorial Misconduct

John Vitillo alleges that the federal prosecutors improperly sought to undermine his credibility throughout the trial by repeatedly (1) emphasizing their presence at the FBI raid and interview and thus vouching for the reliability of Agent Neeson's testimony as to Vitillo's inculpatory statements, which Vitillo denied ever making; and (2) explicitly asking Vitillo whether Agent Neeson was "lying" while on the witness stand. Vitillo objected to the alleged vouching during trial and in his motion for a new trial, but he never objected to any of the "was Agent Neeson lying?" questions, during or after trial.[6]

The "decision to grant or deny a motion for a new trial lies within the discretion of the district court," *United States v. Cimera*, 459 F.3d 452, 458 (3d Cir. 2006), and the District Court's ruling on a challenge to prosecutorial statements objected to at trial is reviewed for abuse of discretion. *United States v. Brennan*, 326 F.3d 176, 182 (3d Cir. 2003). We will

---

[6]Vitillo points to six spots in the trial record where he alleges defense counsel objected to the "was Agent Neeson lying?" questions. It is clear, however, that at these moments Vitillo was objecting to the prosecutor's purported "vouching," not the "was Agent Neeson lying?" questions.

16

review the vouching issue for abuse of discretion and harmless error. However, because Vitillo did not object to the "was Agent Neeson lying?" questions, we will review that issue for plain error. *United States v. Boone*, 279 F.3d 163, 174 n.6 (3d Cir. 2002). To establish plain error, Vitillo must prove that (1) there was error, i.e., a deviation from a legal rule, (2) the error is clear under the law at the time of appellate review, and (3) the error affected substantial rights, i.e., affected the outcome of the proceedings. *United States v. Harris*, 471 F.3d 507, 511 (3d Cir. 2006); *see also Johnson v. United States*, 520 U.S. 461, 467-468 (1997); *United States v. Olano*, 507 U.S. 725, 732-735 (1993). If all three elements are established, we *may* exercise our discretion and award relief, *Johnson*, 520 U.S. at 467, but only if the defendant is "actually innocent" or the error "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Olano*, 507 U.S. at 736 (citation omitted).

### 1. **"Was the Witness Lying?"**

An important issue at trial was whether John Vitillo confessed to Agent Neeson during an interview that took place on the day the FBI searched the Vitillo Corporation offices. Vitillo testified at trial that no such confession was made, whereas Agent Neeson testified to the contrary. The jury had to make a credibility determination. Vitillo argues that the government improperly bolstered the testimony of Agent Neeson by explicitly asking Vitillo whether Agent Neeson was a "liar" or "lying," which placed Vitillo in the unfavorable position of having to accuse a government agent of committing perjury.

At the time of trial, several courts of appeal had held this type of questioning improper because it tended to infringe on the jury's exclusive role as arbiter of witness credibility. *See, e.g. United States v. Thomas*, 453 F.3d 838, 846 (7th Cir. 2006); *United States v. Williams*, 343 F.3d 423, 438 (5th Cir. 2003); *United States v. Sanchez*, 176 F.3d 1214, 1219-1220 (9th Cir. 1999); *United States v. Sullivan*, 85 F.3d 743, 749 (1st Cir.

17

1996); *United States v. Boyd*, 54 F.3d 868, 871 (D.C. Cir. 1995); *United States v. Richter*, 826 F.2d 206, 208 (2d Cir. 1987). We have recently joined this chorus. *United States v. Harris*, 471 F.3d 507, 511 (3d Cir. 2006) ("Today, we follow our sister circuits and hold that asking one witness whether another is lying is inappropriate."). It is clear that, under current law, it was improper for the prosecutor to ask Vitillo whether Agent Neeson was lying.

However, under the plain error standard, a new trial is not warranted here. The prosecutor's questions, while improper, were not prejudicial in light of the overwhelming evidence of Vitillo's guilt presented at trial. *See, e.g. Boyd*, 54 F.3d at 872 (under plain error standard, such questions improper but not prejudicial in light of, *inter alia*, strong evidence of defendant's guilt). Brian Boyer, Vitillo's program manager for the Terminal Expansion Project, testified in detail about how he assisted Vitillo in submitting "false," "inflated" bills to the Airport, in accordance with Vitillo's instructions. Boyer testified that, in February 1999, Vitillo directed him and James Purcell, Vitillo Corporation's accounting assistant, to bill the Airport a minimum of $40,000 per month, without regard to the number of hours actually worked. James Purcell testified and confirmed Boyer's testimony. Both men explained how this overbilling scheme continued for several months. Purcell testified that the bills were inflated between 50 to 100 percent.

Boyer testified that, when the Authority notified Vitillo that his companies' work for the Airport was going to be audited, Vitillo instructed him to compare the time cards recording the hours actually worked with the invoices submitted for payment. Heather Brightbill and Becky Huyett, employees in the Vitillo Corporation accounting department, also testified that Vitillo instructed them to conduct similar comparisons. Purcell, Brightbill and Huyett each testified that Vitillo ordered them to create false time cards to reflect the hours invoiced (rather than the hours actually worked) and to remove the real time cards from the job file and replace them with the phonies. Brightbill testified that this process took several months. Purcell, Brightbill and Huyett testified that the fake time cards

were to be submitted to the Airport for auditing purposes. Purcell testified that Vitillo attempted to hide the original invoices, spreadsheets, and job status reports for the Airport contract. The FBI recovered sets of fake and real time cards from Vitillo's offices, and hundreds of these cards were submitted into evidence at trial.

This is strong evidence of guilt. Furthermore, this evidence stands apart from the disputed confession that gave rise to the prosecutorial misconduct. Although the prosecutor's "was Agent Neeson lying" questions were improper and may have improperly bolstered Agent Neeson's testimony to Vitillo's detriment, there is no doubt that the government's case was amply supported by other strong evidence of guilt. Had the government's case been based primarily on Vitillo's purported confession, the prosecutor's misconduct may have resulted in prejudice warranting a new trial. Such was the case in *United States v. Combs*, 379 F.3d 564, 572-574 (9th Cir. 2004), where the case essentially boiled down to whether the defendant had confessed to a DEA agent. The agent testified that the defendant had confessed, the defendant testified to the contrary, and the prosecution (and the district judge) forced the defendant to answer the question "was the agent lying?" Vitillo's case is much different. There is strong evidence of his guilt unaffected by the prosecutor's misconduct. (Plus, the District Court did not place its imprimatur on the improper questioning.) Unlike in *Combs*, there is no prejudice here.[7] Because the error did not

---

[7]Another principal case relied on by Vitillo, *United States v. Richter*, 826 F.2d 206 (2d Cir. 1987), is distinguishable for similar reasons. In *Richter*, after the defendant gave testimony at trial contradicting the testimony of two government agents, the prosecutor asked the defendant whether the agents were "lying." *Id.* at 208. Because these questions were improper, and the agents' testimony was the only evidence corroborating the testimony of the government's key witness (an unreliable alcoholic), the Second Circuit found plain and prejudicial error
(continued...)

affect the outcome of the proceedings, we need not address whether it seriously affected the fairness, integrity or public reputation of judicial proceedings.

## 2. **Vouching**

Vitillo claims that the government committed further prosecutorial misconduct during his cross-examination (and at other times during the trial) by "subtly, yet effectively, vouching for Agent Neeson's testimony." Specifically, Vitillo argues that the government assured the jury that Agent Neeson was telling the truth about Vitillo's confession by repeatedly emphasizing the fact that AUSAs Goldman and Rice were present during the interview when the confession allegedly took place. By informing the jury of their presence, the prosecutors implied that they knew what Vitillo actually said to Agent Neeson, which in turn assured the jury that Agent Neeson was testifying truthfully. If Agent Neeson was lying, Vitillo's argument goes, the prosecutors – as officers of the court and representatives of the Department of Justice – would have known this and thus would not have introduced Agent Neeson's testimony and relied on it to the extent that they did. As noted above, defense counsel unsuccessfully objected to the alleged vouching at trial and by post-trial motion; we review the District Court's decision for abuse of discretion and harmless error.

For vouching to occur, two criteria must be met: (1) "the prosecutor must assure the jury that the testimony of a Government witness is credible", and (2) "this assurance must be based on either the prosecutor's personal knowledge, or other information not contained in the record." *United States v. Harris*, 471 F.3d 507, 512 (3d Cir. 2006) (quotation marks and

[7](...continued)
and remanded for a new trial. *Id.* In contrast, the government's case against Vitillo was strong and mostly unaffected by the prosecutor's misconduct.

alterations omitted) (citing *United States v. Walker*, 155 F.3d 180, 187 (3d Cir. 1998)). The prosecutor's assurance may be based on either an "explicit or implicit reference" to information outside the record. *Walker*, 155 F.3d at 187. Vouching is not permitted because it can "jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury" as the prosecutor's imprimatur "may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Id.* at 184 (citing *United States v. Young*, 470 U.S. 1, 18 (1985)).

During the government's opening statement, AUSA Goldman described the FBI raid and Agent Neeson's subsequent interrogation of Vitillo and informed the jury that AUSA "Kathleen Rice and myself are there." Later, on direct and cross-examination, the prosecutors made similar passing reference to their presence at the FBI raid and interview and also repeatedly used the pronoun "we" (meaning the prosecutors and the FBI agents) when asking questions about what Vitillo admitted to the government that day. Although it is not clear from the record, government counsel stated at oral argument before this Court that AUSAs Goldman and Rice actually waited in a car as the FBI agents searched Vitillo's offices; only later, after the search was over, did the AUSAs enter the offices to observe Agent Neeson's interview with Vitillo. Government counsel informed us that it was common practice for prosecutors who had observed a defendant's interview to later serve as trial counsel should the government bring the case that far. Counsel also informed us that it was not uncommon for prosecutors to accompany agents into the field and later serve as trial counsel, provided that the prosecutors waited in the car while the search warrants were being executed.

We are concerned by the existence of this practice. It may give rise to the temptation to vouch. If a prosecutor will be tempted at trial to refer to his or her presence at the interview, the prosecutor would do better not to attend the interview. Moreover, a prosecutor who wants to testify as a witness should withdraw as trial counsel for the case. We are also troubled by

the prosecutors' comments at trial. The prosecutors should not have made the jury aware that they were present during the execution of the search warrant or during Vitillo's interrogation.

That said, Vitillo's case is different from most of our other vouching cases in that the challenged comments took place during opening statements and witness examination rather than during closing argument. *See, e.g. Harris*, 471 F.3d at 512-513 (alleged vouching occurred during closing argument); *United States v. Brennan*, 326 F.2d 176, 183-184 (3d Cir. 2003) (same); *United States v. Saada*, 212 F.3d 210, 225 (3d Cir. 2000) (same); *United States v. Dispoz-O-Plastics, Inc.*, 172 F.3d 275, 286 (3d Cir. 1999) (same); *Walker*, 155 F.3d at 185-187 (same); *United States v. Molina-Guevara*, 96 F.3d 698, 703-704 (3d Cir. 1996) (same); *United States v. Bethancourt*, 65 F.3d 1074, 1079 (3d Cir. 1995) (same); *United States v. Zehrbach*, 47 F.3d 1252, 1264 (3d Cir. 1995) (same); *but see United States v. Milan*, 304 F.3d 273, 289-290 (3d Cir. 2002) (no vouching where challenged comments made during witness examination); *United States v. Helbling*, 209 F.3d 226, 240-241 (3d Cir. 2000) (no prejudice where alleged vouching occurred during opening statements and closing argument). The government seizes upon this difference to argue that "assurances" constituting vouching under *Walker* must be clearly presented to the jury during closing argument. Vitillo argues vouching can occur at any time during the trial. Although our cases suggest that vouching most often occurs during summation, we agree with Vitillo that vouching may occur at any point during trial, provided the two elements set forth in *Walker* (and recently reiterated in *Harris*) are satisfied.

We next consider whether vouching actually occurred in this case. On one hand, it was certainly ill-advised for the prosecutors to mention their presence at the FBI raid and interview. We hope the United States Attorney for the Eastern District of Pennsylvania will instruct his assistants accordingly. On the other hand, the comments challenged here are more subtle than the comments giving rise to reversible error in our previous vouching cases. For example, in *Dispoz-O-Plastics*,

22

we found error and prejudice where the prosecutor assured the jury during closing argument that two key government witnesses testified truthfully with regard to two alleged price-fixing agreements entered into by defendants. 172 F.3d at 287. The prosecutor stated: "They [the government witnesses] told the Government they fixed prices twice and *I can guarantee you* the Justice Department doesn't give two for one deals; they had to plead guilty to both price fixing conspiracies and their sentence reflected that." *Id.* at 280 (emphasis added). Similarly, in *Molina-Guevara*, we found error and prejudice where, during closing argument, the prosecutor "told the jury that it was 'insulting' and 'ridiculous' to think that the United States would put on a witness who would lie and assured the jury that 'Agent Lugo did not lie to you.'" 96 F.3d at 704 (alterations omitted).

Nevertheless, we conclude that, in the instant case, the prosecutors' comments and questions referring to their presence at Vitillo's interview constituted vouching. The prosecutors assured the jury that Agent Neeson's testimony was credible based on their personal observations of Agent Neeson's interrogation of Vitillo. For example, AUSA Goldman asked Vitillo this question on cross examination: "Then, after we talked, Agent Neeson talked to you concerning the inflating of the bills, he then asked you about changing the time cards and do you remember admitting to Agent Neeson at that time you changed the time cards because we had to cover the inflated hours, do you remember that, Mr. Vitillo?" The clear implication of this question and other questions and statements like it is that Agent Neeson's testimony was credible because the prosecutors attended the interview and knew for a fact that Agent Neeson was testifying truthfully.[8]

_____

[8]One could actually restate AUSA Goldman's actions in these terms: "I am the prosecutor. I was present during the interview where Vitillo allegedly admitted to Agent Neeson that he fraudulently over-billed the RRAA. Vitillo states that such a confession never occurred. I nonetheless brought this case to trial, and I put Agent Neeson up on the stand. I am not allowed to call a witness when I know that witness will lie on the stand,

(continued...)

23

Ultimately, however, a new trial is not required here in light of the strong evidence of Vitillo's guilt. The prosecutors vouched by implicitly assuring the jury that Agent Neeson truthfully testified that Vitillo confessed to him. Vouching "aimed at the witness's credibility and . . . based on extra-record evidence is deemed non-constitutional error." *Dispoz-O-Plastics*, 172 F.3d at 286. Non-constitutional error is harmless where "'it is highly probable that the error did not contribute to the judgment'" and "the court has a 'sure conviction that the error did not prejudice' the defendant." *Id.* (quoting *Zehrbach*, 47 F.3d at 1265 (en banc) (substituting harmless error analysis for *per se* rule announced in *United States v. DiLoreto*, 888 F.2d 996 (3d Cir. 1989))). Prejudice is determined by examining "the scope of the comments and their relationship to the proceeding, the extent of any curative instructions, and the strength of the evidence against defendants." *Id.*

As discussed above, the government's strongest evidence came not from Agent Neeson's recounting of the purported confession but rather from the Vitillo Corp. employees who described the overbilling scheme in detail and the hundreds of bogus time cards supporting their testimony. Furthermore, the district judge instructed the jury that "[y]ou are the sole and exclusive judges of the facts" and "[y]ou determine the credibility of the witnesses." The district judge also instructed the jury that the "statements[] and arguments of counsel are not evidence in this case." It is therefore highly probable that the prosecutors' passing reference to their presence at the FBI interview did not prejudice Vitillo. *Compare Helbling*, 209 F.3d at 240-242 (finding prosecutor's vouching to be inappropriate but not prejudicial where evidence of defendant's guilt was overwhelming and the district judge gave effective curative

_____

[8](...continued)
and I have an ethical duty to inform the court if one of my witnesses has lied on the stand. I have no intention to inform the court that Agent Neeson lied. I submit to you the testimony of Agent Neeson, but I am not permitted to assure you, the jury, about the credibility of any of the Government's witnesses."

24

instructions) *and Zehrbach*, 47 F.3d at 1267 (same) *with Dispoz-O-Plastics*, 172 F.3d at 286-287 (finding prosecutor's vouching prejudicial where it tainted crucial testimony, the government's case was weak, and the jury instructions failed to neutralize the harm done by the government). We are convinced that any potential error with regard to vouching is harmless.[9]

## C. <u>Restitution</u>

Finally, Vitillo challenges the $317,760 restitution figure set by the District Court.[10] Vitillo argues that the additional $117,760 added to the jury's general loss finding of "more than $200,000" was not based on evidence presented during trial or at the sentencing hearing. We review Vitillo's challenge to the appropriateness of the restitution figure for abuse of discretion. *United States v. Quillen*, 335 F.3d 219, 221 (3d Cir. 2003).

"[R]estitution must be limited to an amount pegged to the actual losses suffered by the victims of the defendant's criminal conduct, and based upon losses directly resulting from such conduct." *Id.* at 226 (quotation and emphasis omitted). The burden of demonstrating the amount of loss is on the government, and any dispute regarding the proper amount is to be resolved by a preponderance of the evidence. 18 U.S.C. §

---

[9]Vitillo also makes a half-hearted argument that the government's colorful remarks during cross-examination and summation (e.g., calling Vitillo a "thief," a "bully boss," and a boy who got his hand "stuck in the cookie jar") constituted prosecutorial misconduct warranting a new trial. In light of the overwhelming evidence of Vitillo's guilt, as discussed above, we find these potential errors to be harmless. *See Helbling*, 209 F.3d at 240, n.11 (no prejudice where prosecutor inappropriately characterized defendant as, *inter alia*, a "looter" and a "thief" with "ugly values").

[10]Post-*Booker*, a sentencing court may determine the amount of restitution owed by a defendant. *See United States v. Leahy*, 438 F.3d 328, 338 (3d Cir. 2006) (en banc).

3664(e). The District Court's factual finding regarding the amount of loss is reviewed for clear error. *United States v. Akande*, 200 F.3d 136, 138 (3d Cir. 1999). To establish "clear error," Vitillo must show that the $317,760 restitution figure is "completely devoid of a credible evidentiary basis or bears no rational relationship to the supporting data." *United States v. Haut,* 107 F.3d 213, 218 (3d Cir. 1997).

Vitillo has failed to meet this heavy burden. At trial, the government presented extensive evidence of the hours overbilled by Vitillo and the corresponding monetary loss sustained by the Authority. Agent Neeson testified to his examination of the phony time cards and inflated bills, which showed overbilling for 4,262.75 hours and a corresponding dollar loss of $317,760.58. The presentence investigation report set forth the overbilling loss at $317,760. Government counsel recapitulated this evidence of loss at the sentencing hearing. Although Vitillo presented a witness at sentencing who calculated the loss to be between $80,000 and $119,000, the District Court's determination of the amount of restitution to be $317,760 is well supported by a preponderance of the evidence.

## III. **CONCLUSION**.

For the foregoing reasons, we will **AFFIRM** the judgment of conviction and the judgment of sentence of the District Court.