**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-1827
_____

UNITED STATES OF AMERICA

v.

JOSE SOTO,
                              Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(District Court No. 2-20-cr-00903-002)
District Judge: Honorable William J. Martini
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
March 28, 2024
_____


Before: RESTREPO, MATEY, and McKEE,
*Circuit Judges*

(Filed: November 20, 2024)

Kevin A. Buchan
Buchan Palo & Cardamone
750 Broad Street
Suite 202
Shrewsbury, NJ 07702
    *Counsel for Appellant*

Mark E. Coyne
Richard J. Ramsay
Office of United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102
    *Counsel for Appellee*

_____

OPINION

_____

McKEE, <u>Circuit Judge.</u>

A jury convicted Jose Soto of one count of conspiracy to commit bank robbery, in violation of 18 U.S.C. § 371, two counts of bank robbery, in violation of 18 U.S.C. § 2113(a), and two counts of using and carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) and 18 U.S.C. § 2.[1] At sentencing, the District Court set his offense level at 29 and ultimately sentenced him at the high-end of his Guidelines range: 289 months in federal

---

[1] **Appx 1010.**

2

prison (including two mandatory and consecutive seven-year terms). Soto's offense level determination incorporated a two-level enhancement for obstruction of justice pursuant to United States Sentencing Guideline ("USSG") §3C1.1. The District Court imposed this enhancement based on allegations that Soto improperly: (1) stepped onto an elevator full of jurors and asked one of them to press the first floor button; (2) interacted with a testifying witness's brother on the weekend of trial; and (3) greeted victims as they entered the courthouse. Because the record inadequately supports this enhancement's application, we will vacate and remand for a new sentencing.

## I.    Background

Law enforcement arrested Jose Soto and Nicholas Ortiz in connection with an armed robbery of PNC Bank in Passaic, New Jersey, on February 6, 2020, and an armed robbery of the Valley National Bank, in Little Falls, New Jersey, on February 27, 2020.

A jury trial ensued. After jury selection, an occasion arose wherein Soto got on an elevator with fourteen jurors for his trial.[2] When he first stepped onto the elevator, he asked one of the jurors to press the button for the "[f]irst floor."[3] Two jurors reported the interaction to a court security officer ("CSO").[4] The Judge responded by reprimanding Soto. The

---

[2] **Appx 187.** There is nothing in the record that indicates whether the jurors were wearing juror badges at the time, but the District Court assumed that they were. *Id.*
[3] **Appx 187.**
[4] *Id.*

Judge told him that, "[h]is conduct is just inexplicable,"[5] and that "it's pretty self-evident that a defendant in a case knows he's not to interact in any way with the jury."[6] Soto's counsel did not deny that the interaction occurred, but noted that the Judge had not previously instructed Soto to avoid any interaction whatsoever with the jurors, and that Soto did not purposefully ignore any of the Court's instructions.[7] The Judge responded by focusing on the consequences of Soto's conduct—not his intention. He said:

> I've had situations in [which] a defendant is walking down a hall, a juror is walking down the hall, the defendant smiles at the juror, says good morning, which is inappropriate too. Those don't seem to be a big issue. Okay? The fact that at least two jurors reported [the elevator interaction] and took the time to come up, see [the CSO] . . . is something we have to address right now.[8]

The Judge then interviewed each juror about the incident; one juror (Juror #2) stated that he could not be objective in weighing the evidence against Soto because of the interaction and was excused.[9]

The prosecutors also alleged that—the morning following the elevator interaction, but before Soto was

---

[5]Appx 193.

[6] *Id*.

[7] **Appx 192.**

[8] Appx 193.

[9] **Appx 224.**

reprimanded by the Court—Soto "approached" the victims scheduled to testify on the steps of the courthouse, to "greet them."[10] He allegedly did so while neglecting to acknowledge any of the FBI agents accompanying the victims.[11] The government averred that it did not see "any indication of a threat or anything like that …."[12] None of the victims testified about this interaction. In response to the government's allegation, Soto's counsel offered his version of the facts: "I was there, he was waiting for me on the courthouse steps. The word 'approach,' I don't think he approached anybody. People walked in and he may have said 'Good morning.' Now that's the extent of what I think happened this morning."[13]

Finally, over the weekend—after trial started, but before co-defendant Ortiz testified—Soto attended, with government permission, a family event in his neighborhood.[14] The government reported that Soto approached one of Ortiz's brothers on the street and asked him whether he was Ortiz's brother.[15] The brother allegedly did not reply and kept walking.[16] The government then explained that Ortiz's mother lives "very, very close to the defendant and that [Ortiz's] brother was visiting the mother and so was in the area of the defendant's residence at that time."[17] Additionally, the government stated that the defendant and Ortiz are "distant

---

[10] Appx 190.
[11] **Appx 190, 983.**
[12] Appx 190.
[13] Appx 192.
[14] **Appx 984.**
[15] *Id.*
[16] *Id.*
[17] Appx 407.

relatives," so it is possible Ortiz's brother and Soto knew each other.[18]

The prosecutor represented that FBI agents had interviewed Ortiz's brother and "confirmed th[e] story" and that the agents were looking into whether they could find surveillance footage to further corroborate it.[19] When later asked whether the government was prepared to bring Ortiz's brother in to testify, the government said that he lived in South Jersey, so it would be difficult to get him to court, but they could possibly have him appear remotely.[20] The Judge suggested that the prosecutor offer the agent's report and said, "[t]hen we'll go from there."[21] The prosecutor agreed.[22] The prosecutor later represented that there existed video evidence of the two passing each other in the street,[23] but neither the government's notes, nor the surveillance footage are part of the record before us, and the Judge made no factual findings related to this interaction.

When deciding to apply the enhancement for obstruction of justice at Soto's sentencing hearing, the Judge explained that §3C1.1 was "very applicable" to the elevator incident.[24] The Judge then acknowledged that the additional "two things" (greeting victims and interacting with Ortiz's brother) "in their own right probably wouldn't result in an

---

[18] *Id.*
[19] Appx 612.
[20] **Appx 647.**
[21] *Id.*
[22] ***Id.***
[23] **Appx 984.**
[24] Appx 988–98.

6

enhancement, but when [combined] with, clearly, getting on an elevator during the course of the trial, not only could have, but did in fact impede and affect at least one juror and caused this Court to have to do a lengthy voir dire of the jurors because of his conduct getting on the elevator. That was not a mistake."[25]

## II. Analysis

On appeal, Soto argues that the District Court made several errors. The only argument that has merit is Soto's claim that the District Court erroneously applied an enhancement for obstruction under USSG §3C1.1.[26]

### A. Applicable Law

As we have previously recognized, individuals are entitled to due process at their sentencing hearings:

> Prosecutors, of course, may not introduce any and all hearsay testimony at a sentencing proceeding. The admission of hearsay statements in the sentencing context is subject to the

---

[25] Appx 989.

[26] Soto also claims the Judge abused his discretion by: (1) allowing the government to admit photographs from Soto's phone that depict stacks of cash and cash strewn about his home; (2) allowing Agent Barile to testify as a lay witness; (3) not permitting Soto to try on a piece of evidence (a glove); and (4) the manner in which he handled the jury's note indicating that there was a deadlock. He also alleges that (5) the Judge failed to consider COVID-19 jail conditions under 18 U.S.C. § 3553(a). For the reasons the District Court explained, all these claims fail.

7

requirements of the Due Process Clause. Under the precedent of this Court, hearsay statements must have some "minimal indicium of reliability beyond mere allegation.[27]

We review the factual findings underlying an obstruction of justice enhancement under §3C1.1 for clear error.[28] Clear error exists only if the district court's ruling was "completely devoid of a credible evidentiary basis or bears no rational relationship to the supporting data."[29] If the factual findings are adequately supported, then "we review the District Court's application of the Guidelines to the facts for abuse of discretion."[30]

The standard of proof for determining willful obstruction of justice is by a "preponderance of evidence."[31] The government has the burden of proving that it is "more likely than not" that the accused willfully obstructed justice.[32] Notably, there must be evidence in the record

---

[27] *United States v. Robinson*, 482 F.3d 244, 246 (3d Cir. 2007) (quoting *United States v. Kikumura*, 918 F.2d 1084, 1102 (3d Cir. 1990)); *see also* USSG §6A1.3(a).

[28] *United States v. Gray*, 942 F.3d 627, 633 (3d Cir. 2019). This Court has jurisdiction to review the judgment under 18 U.S.C. § 3742(a)(2) and 28 U.S.C. § 1291.

[29] *United States v. Vitillo*, 490 F.3d 314, 330 (3d Cir. 2007) (quoting *United States v. Haut*, 107 F.3d 213, 218 (3d Cir. 1997)).

[30] *United States v. Kluger*, 722 F.3d 549, 555 (3d Cir. 2013).

[31] *United States v. Kim*, 27 F.3d 947, 960 (3d Cir. 1994).

[32] *See, e.g.*, *United States v. Belletiere*, 971 F.2d 961, 966 (3d Cir. 1992) (finding that the prosecution failed to meet its burden because it failed to introduce any evidence that could

supporting the District Court's findings.[33]  Although the record need not contain direct evidence of the conduct, other evidence must be present in the record to support an inference that the individual willfully obstructed justice.[34]

## B. The Factual Findings Do Not Support Soto's Enhancement

Here, the factual findings required to support this enhancement are completely absent from the record.  First, the District Court did not explicitly adopt the findings of the presentence report ("PSR"), which incorporated all three allegations of obstruction.  But even if it had, after weighing the government's evidence, courts "may accept any *undisputed* portion of the presentence report as a finding of fact."[35]  Instead, Soto objected and provided "detailed reasons" why the "findings were unreliable."[36]  The PSR itself made that clear with respect to the family incident. A footnote specified that

have made it more likely than not that Belletiere "willfully" attempted to obstruct justice).

[33] *See United States v. Douglas*, 849 F.3d 40, 50–51 (3d Cir. 2017), *rev'd en banc on other grounds*, 885 F.3d 124 (3d Cir. 2018) (finding that the district court inappropriately applied an obstruction of justice enhancement when it relied on factual findings not supported in the record regarding Douglas's "willfulness").

[34] *Kim*, 27 F.3d at 960–61 (reasoning that even though the record did not contain direct evidence of Kim's false cooperation and misstatements, other evidence in the record allowed the district court to make that inference).

[35] Fed. R. Crim. P. 32(i)(3)(A) (emphasis added).

[36] *United States v. Campbell*, 295 F.3d 398, 406 (3d Cir. 2002)).

"[d]efense counsel objected to this claim and stated there was no evidence of any interaction between Soto and Ortiz's brother."[37]  The same footnote went on to note that the government "submitted video footage showing the two men passing on the street and Soto turning back several times," and that there was "no audio recording of the interaction" that was reported to the police by Ortiz's brother.[38] The Judge did not rule on these objections, rendering full adoption of the PSR impossible. Thus, the unadopted PSR could not have, by itself, supplied a factual basis to support the District Court's findings.

And while the record does include passing *references* to an FBI affidavit and surveillance footage,[39] neither piece of evidence is actually *in* the record, and it is far from clear that the District Court considered them.  Meanwhile, Soto explicitly denied that there was ever any interaction with Ortiz's brother, "much less an attempt at an 'indirect threat.'"[40] He also argued that any interaction with members of the jury or other witnesses was "inadvertent and not intended to be any kind of threat or obstruction of justice in any way."[41]  The District Court declined to hold a hearing on these issues and failed to enter into the record any of the support the government claimed it had, but nonetheless applied the obstruction enhancement.

Due process was therefore lacking here.  In applying the obstruction enhancement, the District Court improperly relied

---

[37] Appx 1031.
[38] *Id.*
[39] *See* **Appx 612, 984.**
[40] Appx 940.
[41] *Id.*

upon the government's unsubstantiated allegations about Soto's interactions with victims and a testifying witness's brother. The District Court's application of a sentencing enhancement without supporting evidence requires remand and resentencing.

C. The District Court Abused its Discretion by Inferring Soto's Intent Solely from his Elevator Conduct

While there was adequate record evidence to support the District Court's finding that Soto entered the elevator with jurors and asked them to press the button for floor one, it would have been an abuse of discretion for the District Court to infer wrongful intent from this action alone.

We have defined "willfully," as used in §3C1.1, as acting consciously ("deliberately or intentionally") with the purpose of obstructing justice, as opposed to "negligently, inadvertently, or accidentally."[42] Obstructive conduct under §3C1.1 includes "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so."[43] Further, we have held that the obstruction of justice enhancement may apply only when an individual acts *willfully*—that is, with the purpose of achieving an obstruction of justice.

---

[42] *United States v. Jenkins*, 275 F.3d 283, 287 (3d Cir. 2001) (finding that the individual's "failure to appear in state court was an intentional action, one taken with full awareness of the proceedings").

[43] USSG §3C1.1, cmt. n. 4(a).

11

District courts in our Circuit often infer willfulness based on behavior far more outlandish than what the court determined Soto did here.[44] Although Soto's behavior may

[44] *See, e.g., United States v. Green*, 617 F.3d 233, 238 (3d Cir. 2010) (yelling "bitch I oughta kill your fucking ass" at government witness); *United States v. Williams*, 591 F. App'x 78, 96 (3d Cir. 2014) (nonprecedential opinion) (making threatening telephone calls to coerce co-defendant into not testifying at trial); *United States v. Webb*, 499 F. App'x 210, 214 (3d Cir. 2012) (nonprecedential opinion) (asking brother to confront a critical witness during his trial for armed robbery); *United States v. Carter*, 293 F. App'x 954, 957 (3d Cir. 2008) (nonprecedential opinion) (leaving a voice message for witness stating, "loose lips sink ships" and "you should be running instead of running your mouth" and witness testifying that they considered such statements to be a threat); *United States v. Rinick*, 219 F. App'x 238, 241–42 (3d Cir. 2007) (nonprecedential opinion) (threatening to kill someone who called him a "rat"); *United States v. Bush*, 94 F. App'x 101, 102 (3d Cir. 2004) (nonprecedential opinion) (writing, in a letter to wife while awaiting sentencing, that he would "get that prosecutor . . . for doing this to me," and would get witness "for fucking up our getaway trip for that weekend").

The parties' briefing on whether this conduct (alone or in combination with the two other incidents) rises to the level of obstruction necessary to justify an enhancement is sparse. Soto only cites *Jenkins*, 275 F.3d at 287 (**Appellate Br. 32**), for the proposition that §3C1.1 requires willfulness. The government cites no analogous cases whatsoever but includes one string cite for the proposition that the district court, as the

have been "inappropriate," the District Court's focus was not on Soto's intent to obstruct—the critical element to apply this enhancement—but on the fact that two out of fourteen jurors were made uncomfortable by sharing an elevator with him. Indeed, the court made no mention of the other jurors who either did not care or, in some instances, did not even notice.[45] In recognizing that an accused person greeting a passing juror by saying "good morning" is inappropriate but is not a "big issue,"[46] the District Court acknowledged that not all "inappropriate" behavior creates an inference of intent necessary for an enhancement, and we certainly agree. While there is evidence that Soto's conduct made Juror #2

_____

finder of fact, determines the motive for a defendant's actions and what was meant by the defendant's statements. **(Appellee Br. 49).** The support for this proposition is largely out-of-circuit. The only in-circuit case the government includes is *United States v. Adair*, 38 F.4th 341, 354 (3d Cir. 2022), which stands for the proposition that the court can evaluate factual findings in the record for purposes of an enhancement of §3B1.1. In doing so, the government overlooks that much of what it describes is not in the record; they are accusations that the District Court apparently accepted without any factual finding or record support.

[45] *See, e.g.*, Appx 204 ("JUROR NO. 3: No, actually nothing happened. He just -- he was, like, one of the last people to get in the elevator, so . . . ."); *id.* at 205 ("JUROR NO. 4: No, no, no, it's fine. I'm okay with it. It's fine."); *id.* at 211 (In response to being asked whether Juror No. 9 would hold the interaction against the defendant he stated, "No, everybody's gotta get downstairs"); *id.* at 211–12 (Jurors No. 10 and 11 did not even recall that Soto stepped into the elevator).

[46] Appx 193.

13

uncomfortable, that evidence does not bear on the ultimate issue: whether Soto *intended* to cause the jurors to feel uncomfortable. And, in any event, nearly all the other jurors were unfazed by this interaction, if they even noticed it at all.[47]

Given the logistical limitations and configurations of many courthouses, it will often be difficult to prevent the kind of interaction that apparently occurred between Soto and his jurors without proof of the accused's mindset.[48] Without more, Soto's request that a juror push an elevator button for a particular floor is simply the kind of interaction that occurs in daily life. After all, the juror may have been even more threatened if Soto had approached her and reached across her to push the button himself. Moreover, although it could be argued that Soto should simply have not gotten on the elevator, nothing suggests that he was ever so advised. In sum, there is simply not enough in this record to justify a conclusion that Soto intended to obstruct justice.

Moreover, we fail to see how Soto's elevator behavior is materially different from the passing greeting the District Court described, and the District Court provides no explanation. It merely acknowledged that his behavior "did in fact impede" justice because the Court was required to conduct "a lengthy voir dire because of his conduct getting on the

---

[47] **Appx 200–17.**

[48] This risk is heightened where judges hold court at unusual hours, as here. *See* Appx 189 ("To be candid, I don't think there [are] too many other jurors here for other cases here at 8:00 in the morning because most judges don't start early. I don't know if there's a better solution in terms of how we're entering and exiting the courthouse and the courtroom.").

14

elevator."[49]   The District Court imposed the enhancement because Soto's conduct did in fact impede the proceedings; but the obstruction of justice enhancement under the Guidelines turns on his intent—not the consequences of actions.[50]

In sum, the District Court committed clear error by improperly relying on allegations not supported in the record. Even if it had exclusively relied on what is in the record, the Court would have abused discretion by applying the enhancement; Soto's behavior here is simply not enough to support an inference that he willfully intended to obstruct justice, and courts simply cannot read "obstruction" into such everyday interactions without more than what appears on this record.

As the District Court noted, greeting a juror with "good morning" will often be inconsequential,[51] even though it could also be interpreted as intimidation.  Relying on such conduct to impose a sanction for obstruction of justice puts the accused on the horns of a dilemma.  On the one hand they may very well believe that ignoring a passing juror would be interpreted as an act of rudeness that would adversely reflect upon them.  On the other hand, greeting the passing juror with something as mundane as "good morning" might be interpreted as ill-advised, an improper communication, or some kind of intimidation.  The fundamental guarantee of due process simply does not allow a court to imprison someone for such

---

[49] Appx 989.

[50] *See* USSG §3C1.1, cmt. n. 2 (advising the court to ensure behavior under this enhancement "necessarily reflect[s] a *willful* attempt to obstruct justice") (emphasis added).

[51] Appx 193.

conduct without more than what appears on this record. Accordingly, the District Court erred in applying a sentencing enhancement for this innocuous conduct under the circumstances here.

## III.    Conclusion

Although this record compels our conclusion that a sentencing enhancement for obstruction of justice was not justified under the circumstances here, it goes without saying that jurors perform an absolutely essential function. We therefore take this opportunity to reiterate the importance of taking all reasonable and appropriate measures to ensure their safety and security as well as the need to create an atmosphere that will allow them to deliberate without fear or apprehension. Citizens who sacrifice their time and convenience to discharge the constitutional obligation of jury duty perform a service that is essential for the proper functioning of our system of justice. Courts must remain vigilant in ensuring that jurors do not have a reason to question the priority courts assign to providing a "safe space" for the discharge of that service. Nevertheless, for the reasons we have explained, we are satisfied that the defendant's conduct here did not rise to the level of compromising the safety or security of these jurors. Accordingly, imposition of this obstruction enhancement was clear error. There is simply "no rational relationship" between the enhancement and "the supporting data."[52]

---

[52] *Vitillo*, 490 F.3d at 330.