**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-3790
_____

JAMES OGUNYEMI FRIDAY,
AKA Friday James,
Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,
Respondent
_____

On Petition for Review of an Order of the Board of Immigration Appeals
(A078-510-752)

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
September 25, 2018

Before:  AMBRO, CHAGARES, and GREENAWAY, JR., Circuit Judges.

(Filed: September 28, 2018)

_____

OPINION[*]
_____

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

CHAGARES, Circuit Judge.

Petitioner James Ogunyemi Friday challenges the decision of the Board of Immigration Appeals ("BIA") concluding that, as a result of his tax fraud conviction, he is removable as an aggravated felon. As explained below, we conclude that Friday's stipulation at sentencing that a restitution order of $145,156 would be appropriate was a concession that the actual loss tied to his counts of conviction was in excess of $10,000, qualifying his 26 U.S.C. § 7206(2) conviction as an aggravated felony and rendering him removable under 8 U.S.C. § 1227(a)(2)(A)(iii). Because the BIA did not err in determining that Friday had committed an aggravated felony, we have no jurisdiction to review the BIA's final order of removal, so we will deny Friday's petition for review.

I.

We write for the parties and so recount only the facts necessary to our decision. Friday is a citizen of Liberia who has been a lawful permanent resident of the United States since 2009. In 2013, he was convicted of 26 counts of aiding and assisting in the preparation and filing of materially false tax returns, in violation of 26 U.S.C. § 7206(2). The parties and the District Court agreed with the Presentencing Report ("PSR") that the loss calculation for the purposes of determining Friday's sentence — which, per the Sentencing Guidelines, includes intended loss stemming from the entire "course of conduct," whether or not charged, see United States Sentencing Guidelines ("U.S.S.G.") § 2T1.1(c)(1) & cmt. n.2, 2T1.4 cmt. n.1 — was $1,215,562. Based on the resulting total offense level of 24, the Guidelines recommended a sentence of between 51 and 63

2

months of imprisonment, but the District Court departed downward and sentenced Friday to 36 months of imprisonment. Furthermore, citing Friday's inability to pay and the difficulty involved in the calculation, the District Court ordered no restitution, thereby rejecting the parties' agreement that a restitution order of $145,156 — which the Government explained was "the actual fraud loss that can be traced to the counts of conviction" — would be appropriate. Administrative Record ("AR") 143.

The Department of Homeland Security thereafter sought to have Friday removed under the Immigration and Nationality Act ("INA") as an alien convicted of an "aggravated felony," 8 U.S.C. § 1227(a)(2)(A)(iii), which in turn is defined to include an offense that "involves fraud or deceit in which the loss to the victim or victims exceeds $10,000," id. § 1101(a)(43)(M)(i). Friday contended that his conviction did not meet the monetary threshold, but the Immigration Judge ("IJ") concluded, based on Friday's failure at sentencing to object to the PSR's loss calculation of "over a million bucks," that the Government had carried its burden to show by clear and convincing evidence that the loss exceeded $10,000. Administrative Record ("AR") 600–01. Friday appealed, and the BIA remanded. Relying on Supreme Court and our precedent requiring a nexus between the counts of conviction and the actual loss, the BIA concluded that the PSR's calculation, based on the loss attributed to Friday's entire course of conduct (consisting of roughly 2000 fraudulent returns), did not provide clear and convincing evidence that more than $10,000 in losses resulted from the 26 returns for which Friday was convicted. AR 366–67.

3

On remand, the IJ reaffirmed that Friday was removable. This time, the IJ relied upon the Government's statement at sentencing that the loss traceable to the counts of conviction was $145,156, to which Friday's counsel "concurred," as proof that a loss of over $10,000 resulted from the 26 returns for which Friday was convicted. AR 358–59. On appeal, the BIA agreed that the sentencing colloquy "clearly and convincingly supports the finding that the loss to the victim exceeded $10,000, and that that loss was tied to the twenty-six specific counts covered by the actual conviction," and dismissed the appeal. AR 3–4. Friday timely petitioned this Court for review.

II.

The BIA had jurisdiction under 8 C.F.R. § 1003.1(b)(3), and we have jurisdiction to review the BIA's final order under 8 U.S.C. § 1252(a). Although we lack "jurisdiction to review any final order of removal against an alien who is removable by reason of having committed" an aggravated felony, 8 U.S.C. § 1252(a)(2)(C), we retain jurisdiction to decide the prior question of whether the charged crime is an aggravated felony, which we consider de novo, Singh v. Att'y Gen, 677 F.3d 503, 508 (3d Cir. 2012).

Because the quantum of loss specified in § 1101(a)(43)(M)(i) is not an element of the underlying offense but rather a "specific circumstance[] in which a crime was committed," courts are not constrained to the modified categorical approach and may look to the "sentencing-related material" in order to determine whether the crime meets the monetary threshold. Nijhawan v. Holder, 557 U.S. 29, 38, 42 (2009). Sentencing materials may include, among other things, the sentencing memoranda, PSR, parties'

4

stipulations, and sentencing transcripts.  See Kaplun v. Att'y Gen., 602 F.3d 260, 266 (3d Cir. 2010).  In assessing whether these materials support qualifying a conviction as an aggravated felony, a court must assure itself by clear and convincing evidence that an actual loss of more than $10,000 resulted from the "specific counts covered by the conviction."  Nijhawan, 557 U.S. at 42; see also Singh, 677 F.3d at 510–12.  Losses arising from acquitted, uncharged, or related conduct may not factor in to the § 1101(a)(43)(M)(i) analysis.  Nijhawan, 557 U.S. at 42.  The Supreme Court has cautioned that this determination must be made "with an eye to . . . the burden of proof employed," id. (quoting In re Babaisakov, 24 I. & N. Dec. 306, 319 (2007)), and considered in light "of any conflicting evidence" in the record, id.

III.

The parties agree that a violation of 26 U.S.C. § 7206(2) is an offense that involves fraud, so the sole question before us is whether the offenses for which Friday was convicted involved an actual loss to the victim (here, the Government) that exceeded $10,000.  This seemingly straightforward analysis is complicated by the absence of a minimum dollar requirement in § 7206(2) and the Sentencing Guidelines' reliance on intended — rather than actual — loss for purposes of determining punishment.  In the context of a § 7206(2) conviction, there may be no reason for the Government to expend energy conclusively establishing the oftentimes difficult-to-determine quantum of actual loss.  The disincentive to prove actual loss is furthered where the defense stipulates to the fraud loss and the suggested amount of restitution.  In the absence of a stipulation, in

5

order to establish the restitution amount the Government would have to establish, by a preponderance of the evidence, "the actual losses suffered by the victims of the defendant's criminal conduct, and based upon losses directly resulting from such conduct." United States v. Vitillo, 490 F.3d 314, 330 (3d Cir. 2007) (quoting United States v. Quillen, 335 F.3d 219, 226 (3d Cir. 2003)); see also Singh, 677 F.3d at 513 ("[C]ourts ordering restitution . . . are limited to remedying the actual loss caused by the defendant's 'offense of conviction.'" (quoting Hughey v. United States, 495 U.S. 411, 413 (1990)). In other words, establishing the restitution amount requires the Government to undertake the intricate task of establishing the actual losses that flowed from the specific offenses for which the defendant was convicted.

Sure enough, no mention of actual loss was made in this case until the sentencing hearing, when the Government amended an inaccuracy in the PSR and its sentencing memo. Nevertheless, we agree that despite the District Court's refusal to order restitution, the Government's assertion that $145,156 was "the actual fraud loss that can be traced to the counts of conviction," along with Friday's counsel's agreement that it would be "appropriate . . . for the Court to order that full amount of restitution," AR 143–44, provide clear and convincing evidence that Friday was convicted of an aggravated felony. Absent countervailing evidence, a party's stipulation regarding the actual loss amount may be treated as conclusive. See, e.g., Doe v. Att'y Gen., 659 F.3d 266, 275–76 (3d Cir. 2011); Tian v. Holder, 576 F.3d 890, 896 & n.4 (8th Cir. 2009); cf. Munroe v. Ashcroft, 353 F.3d 225, 227 (3d Cir. 2003).

6

Our review of the sentencing transcript and the PSR provides additional support for the conclusion that the counts of conviction resulted in greater than $10,000 in actual losses. For instance, the District Court notes its understanding that the IRS "improperly credited" either $7,500 or $8,000 "in almost every" one of Friday's returns that improperly claimed a First Time Home Buyer's Credit. AR 147. Thirteen of the twenty six returns the Friday was convicted of fraudulently filing improperly claimed that Credit on behalf of clients. If almost every such return included such a significant payout, it is no surprise that the loss amount for the counts of conviction would be in excess of $10,000.[1] Moreover, the District Court's rejection of the parties' agreed-to restitution

---

[1] The fact that some or even much of the improperly provided credits have been repaid — thereby reducing the restitution amount — does not lower the determination of the "actual loss" amount. There is no bright-line rule concerning the time at which we fix the actual loss, but where a fraud perpetrator deprives a victim of property without providing any security to counterbalance the deprivation, the loss is determined as of the time of detection, not the time of sentencing. See Singh, 677 F.3d at 518 ("[P]ayment of restitution should not, and does not, negate a loss that actually occurred. . . . It doesn't matter how fleetingly the person obtains control. If the person's offense deprives the defrauded party of property, an actual loss occurs to an actual victim under [8 U.S.C. § 1101(a)(43)(M)(i)]."). The rationale is that where a fraud perpetrator pledged collateral in exchange for the fraudulently induced payment, the victim's loss is reduced by the value of the collateral in their possession, and so at sentencing the value of that collateral should be deducted before determining the victim's actual loss. See United States v. Saunders, 129 F.3d 925, 931 n.4 (7th Cir. 1997). But here, where, as in the case of check kiting, the victim will bear the entire loss, the actual loss is determined at the time of the fraud's detection without any reduction for "fortuit[ous]" repayments made thereafter. United States v. Shaffer, 35 F.3d 110, 115 (3d Cir. 1994) (noting the unfairness that would result from calculating loss at the time of sentencing, because it could yield different sentences for identical defendants if one of them is able to repay the victim between conviction and sentencing); United States v. Mummert, 34 F.3d 201, 204 (3d Cir. 1994) ("A defendant in a fraud case should not be able to reduce the amount of loss

7

order derived not from its rejection of the quantum of the loss, but of its conclusion that Friday would be unable to pay such a sum and that calculating restitution — which would involve linking actual losses to the counts of conviction, deducting third-party repayments, and monitoring to reduce Friday's restitution burden as repayments come in — was "too complicated to determine at sentencing." AR 144–45. The District Court instead instructed Friday to discuss the issue directly with the IRS, who "keep tabs" on the repayments and can independently impose restitution. AR 145. This colloquy makes clear that the District Court both accepted that there was a quantum of actual loss that remained outstanding, and that the number was significant enough that it would prove too difficult to calculate in the first instance or to track as additional payments came in. If that actual loss was below $10,000, we suspect that the calculation would not have been as difficult — nor the ongoing monitoring as onerous — as the District Court feared.

We are unpersuaded by the allegedly "conflicting" evidence that Friday asserts undermines confidence in this conclusion. First, he argues that we should not accept at face value the Government's extremely clear proffer — adopted by his counsel — that "the actual fraud loss that can be traced to the counts of conviction" is $145,156, because

_____

for sentencing purposes by offering to make restitution after being caught."). Given that restitution is meant to "make the victim whole" and may not "result in the payment to the victim of an amount greater than the victim's loss," United States v. Diaz, 245 F.3d 294, 312 (3d Cir. 2001), the net-payout (that is, accounting for other repayments to the victim) is relevant for determining restitution at the time of sentencing. But it should play no role in determining the actual loss for the purposes of deportability, which must be ascertained at the time of the fraud's detection.

8

the Government in its sentencing memo had been imprecise when explaining whether the loss amount included relevant conduct. In one instance, the Government asserts that the $1,215,562 number was "[t]he fraud loss associated with the charged returns," AR 322 n.3, and in another the Government explains that the number "includes the loss arising from the counts of conviction as well as [Friday's] relevant conduct," AR 326 n.20. Friday argues that these quotes show that the Government failed consistently to represent the provenance of the asserted fraud loss of $1,215,562, sometimes arguing that it was related only to the "charged returns" while at other times indicating correctly that it included the uncharged "relevant conduct." Friday Br. 23. In light of this alleged sloppiness, Friday maintains that we cannot take the Government at its word when it asserted at sentencing that the "actual" loss "traced to the counts of conviction" does not also include relevant conduct.

But the two instances that Friday points to suggest no such imprecision. As we explained, the only relevant consideration for sentencing purposes was the total loss intended by the entirety of Friday's illegal conduct. See U.S.S.G. § 2T1.1(c)(1). It is entirely consistent both to acknowledge that the total fraud loss amount includes relevant conduct and also to assert — in language similar to that used in the Guidelines — that it is the loss "associated with" the charged returns, meaning the loss that the Sentencing Guidelines deem applicable to the scheme represented by the counts of conviction. See id. § 2T1.1 cmt. n.2 ("In determining the total tax loss attributable to the offense . . . all conduct violating the tax laws should be considered as part of the same course of conduct

9

or common scheme or plan . . . .").  More importantly, unlike at the sentencing hearing, in neither of the alleged imprecise statements did the Government assert that $1,215,562 represented "actual" losses directly "traced" to (as opposed to generally "associated with") the counts of conviction.  The use of that term at the hearing makes clear that the Government had excluded the losses resulting from relevant conduct.  We discern no basis in the record to undermine the conclusion that the Government meant what it said when it represented to the District Court that $145,156 was the proper restitution figure, and that Friday's counsel meant what he said when he agreed with that position.

We are likewise unswayed by Friday's argument that the Government arrived at the restitution number by simply deducting from the $1,215,562 figure the amount of refunds that the IRS had recouped without also deducting from that figure the losses tied only to relevant conduct.  At sentencing, the Government corrected the PSR's restitution recommendation to account — as the law requires — only for the actual loss traceable to the counts of conviction.  The Government added that the corrected actual loss figure was subject to change as the IRS continued to recoup refunds, which would result in a lower actual loss.  Friday reads the Government's caveat as applying to the derivation of the actual loss number, such that it was reached by deducting repayments but not uncharged or acquitted conduct.  But the more natural reading — based on the Government's introduction of the revised figure by discussing actual loss traceable to the counts of conviction — is that the actual loss number was derived by looking only at the losses sustained from the counts of conviction, and that even that revised number might be

10

further amended as repayments come in. To accept Friday's theory would be to discount entirely the Government's precise description of the revised restitution figure as being the actual loss tied to the counts of conviction. As we already noted above, the record provides no support for such interpretive calisthenics.

We are mindful of the lower preponderance standard governing the determination of the loss amount for sentencing and restitution, see Vitillo, 490 F.3d at 330, and of the potential effect of that evidentiary standard on a defendant's decision to stipulate to the Government's proposed loss amount. It is surely plausible that a defendant might stipulate to a loss amount for restitution purposes that is higher than he or she believes is the actual loss to the victim directly attributable to the counts of conviction out of fear that, if they do not, the Government could by a preponderance establish an even greater loss. However, the Supreme Court has expressly relied on a "defendant's own stipulation, produced for sentencing purposes," to conclude that a loss met the threshold for an aggravated felony. Nijhawan, 557 U.S. at 42. Our Court has followed suit, and has relied on the defendant's stipulation of the loss amount, even though the loss amount was not an element of the offense and thus could have been established under the preponderance standard. See, e.g., Doe, 659 F.3d at 275 (relying on loss stipulation in a plea agreement regarding conviction for a wire fraud offense that "makes no distinctions on the basis of the amount of loss"). Our sister courts have done the same. See, e.g., Kawashima v. Holder, 615 F.3d 1043, 1051, 1055 (9th Cir. 2010), aff'd, 565 U.S. 478 (2012); Tian, 576 F.3d at 896 & n.4; Arguelles-Olivares v. Mukasey, 526 F.3d 171, 179

11

(5th Cir. 2008).  We conclude that Friday's agreement to $145,156 of restitution is clear and convincing evidence that the actual loss stemming from his counts of conviction was more than $10,000.[2]

IV.

In light of the foregoing, we will deny Friday's petition for review.

---

[2] We have considered and we reject Friday's other claim that the BIA improperly engaged in factfinding in contravention of 8 C.F.R. § 1003.1(d)(3)(iv) when it agreed that the loss amount was established by "clear and convincing evidence" even though the IJ failed to mention that standard of review.  The BIA relied only on the facts that the IJ considered, so it made no independent factfinding.  Regardless, considering that the Court in Nijhawan itself determined that certain evidence was clear and convincing, see 557 U.S. at 43, we doubt whether such a determination is a factfinding at all.

12